THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DONALD J. REDING, Defendant-Appellant.

Second District No. 2—87—0486

Opinion filed December 7, 1989.

G. Joseph Weller, of State Appellate Defender's Office, of Elgin, and

Daniel D. Yuhas and Jeffrey Bergschneider, both of State Appellate Defender's Office, of Springfield, for appellant.

Gary V. Johnson, State's Attorney, of Geneva (William L. Browers, Robert J. Biderman, and Rebecca L. White, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE McLAREN delivered the opinion of the court:

Defendant, Donald Reding, was found guilty after a jury trial of reckless homicide (Ill. Rev. Stat. 1985, ch. 38, par. 9—3) and was sentenced to 24 months' probation, four weekends' periodic imprisonment, a $500 fine, and court costs. Defendant appeals from this conviction.

On appeal, defendant contends that this court should reverse his conviction or reverse and remand for a new trial based upon the following alleged errors at trial: (1) the court should not have admitted evidence of Reding's blood-alcohol content without first making a preliminary finding that the testing was reliable; (2) the court should not have admitted improper testimony of the State's accident reconstruction expert; (3) the State should not have been allowed to cross-examine Reding and other witnesses concerning Reding's prior use of alcohol; (4) the defendant should have been allowed to cross-examine the breathalyzer technician concerning "false highs" registered by the breathalyzer machine in connection with another case; (5) the court should have allowed Reding to impeach a police officer by questioning him about omissions in his police and accident reports; (6) the court should not have given Illinois Pattern Jury Instructions, Criminal, No. 23.06 (2d ed. 1981) because it violated Reding's due process rights; (7) Reding's attorney should not have tendered Illinois Pattern Jury Instructions Criminal 2d No. 23.05, as this constituted ineffective assistance of counsel; and (8) Reding was not proved guilty beyond a reasonable doubt.

On July 16, 1986, Reding was charged with reckless homicide. (Ill. Rev. Stat. 1985, ch. 38, par. 9—3.) This charge arose out of a May 12, 1986, automobile/motorcycle accident that resulted in the death of the driver of the motorcycle, Craig Miraglia.

Prior to trial, Reding moved to suppress the results of a breathalyzer test administered shortly after the accident. Reding alleged that the results of the test were unreliable and admission of this evidence would violate his due-process rights and right to a fair trial. Reding stated that he had a witness who would testify to Reding's actual solubility ratio as tested several months after the accident. A sol-

ubility ratio is the ratio of alcohol in the blood to alcohol in the breath. Reding's witness would testify that Reding's actual solubility ratio was 1,681:1 as opposed to the 2,100:1 ratio built into the breathalyzer machine. The significance of this fact is that Reding's blood-alcohol content would have been .0864% instead of .12% as registered by the breathalyzer.

The State moved to strike Reding's motion, and the court granted this motion. The court found that Reding did not establish that evidence of his blood-alcohol content was inadmissible. The court stated:

> "I'm not able to agree with you that it is not a question of fact for the jury. It's something that I assume you would be able to show to the jury as it relates and then the jury will determine how much weight they want to give the test result and how much weight they want to give your expert's testimony."

The court struck the motion so as to avoid the necessity of going forward with a hearing on it. Reding renewed his motion, and the court again denied it without a hearing.

At trial, Thomas Bumgarner, a Kane County deputy sheriff, testified. He was dispatched to an accident scene at approximately 8 p.m. on May 12, 1986. Upon his arrival, he saw a motorcycle lying on its side just off the roadway and a pickup truck in a nearby driveway. Officer Ronnie Grommes and an ambulance were at the scene. Grommes suggested that Bumgarner speak with the driver of the truck, Reding. Grommes also informed Bumgarner that Reding's breath smelled of alcohol.

Reding informed Bumgarner that he was driving west on Plank Road and, as he turned across the eastbound lane into his driveway, the motorcycle driven by Miraglia collided with his truck. Reding indicated that he did not see the motorcycle before impact. Reding also told Bumgarner that he had recently consumed a couple of beers at a local tavern. Bumgarner further testified that Reding's breath had a strong odor of alcohol, he was swaying, his speech was confused, his eyes were bloodshot and watery, and his appearance was "disheveled." Bumgarner administered two field sobriety tests to Reding, and Reding failed both tests. Bumgarner testified that at this point he felt Reding was under the influence of alcohol. Bumgarner informed Reding that he was under arrest and transported him to the sheriff's office.

Bumgarner testified that, upon arrival at the sheriff's office, Reding was informed of his rights, and he appeared to understand them. Reding submitted to a breathalyzer test. The result of this test was a blood-alcohol content of .12%.

John Dorko testified on direct examination that he is a breathalyzer technician responsible for recertifying breathalyzer machines. Dorko stated that he introduces a solution containing .10% alcohol into the machine, and if he receives a reading within .005% of .10% on two occasions, then he recertifies the machine. Dorko testified that he recertified the machine used by Reding on April 30, 1986, and on May 23, 1986.

Dorko testified on cross-examination that there is an assumption built into the breathalyzer machine. The assumption is that one unit of alcohol on the breath is equal to 2,100 units of alcohol in the blood. Dorko stated that, if a person has a lower breath to blood-alcohol ratio, that person's blood-alcohol content would be lower than that registered by the breathalyzer.

Defendant then attempted to question Dorko concerning tests he performed on the breathalyzer machine approximately 10 days prior to trial. These tests were performed as a result of a separate and unrelated case. The State objected and argued that this information was irrelevant as it pertained to a test performed eight months after the breathalyzer was used to test Reding. The court sustained this objection.

Eric Norwood, an accident reconstruction officer for the Illinois State Police, was then called to testify. Norwood testified that his services were requested by the Kane County sheriff's department. Norwood inspected the scene of the collision approximately four days after the accident. Norwood observed a skid mark and measured it to be 56 feet long. Norwood also conducted a drag factor test to determine the coefficient of friction of the roadway. The roadway was made of asphalt, fairly new and bordered by gravel shoulders. Norwood also visited the Kane County impound facility and examined the vehicles involved approximately seven days after the collision. Norwood discovered that the truck sustained damage to its right front fender, bumper, hubcap and hood. The motorcycle sustained damage to its exhaust system, front fender, headlamp assembly, turn signals, gas tank and handlebars. The motorcycle's lights, brakes, linkage and transmission were in working order. Through his investigation, Norwood discovered that at the time of the accident it was 58 degrees, clear, with no precipitation, and the sun was near the horizon in the west.

Norwood further testified that, based upon his investigation, it was his opinion that the motorcycle was traveling eastbound at approximately 50 miles per hour before applying its brakes and had slowed to approximately 20 to 25 miles per hour at the time of im-

pact. The collision occurred in the eastbound lane of the roadway as the truck turned across this lane to enter a driveway. Norwood further opined that the location of the sun was not a factor in the accident, Reding's consumption of alcohol was a factor in the accident, and the accident was caused by Reding's improper tactics.

Dr. Daniel J. Brown, a toxicologist for the Illinois State Police, testified that alcohol is absorbed into the bloodstream at varying rates. Dr. Brown stated that a person weighing 185 pounds with a blood-alcohol content of .10% would experience a loss of visual and mental acuity, a slower reaction time and an impairment in judgment. Dr. Brown opined that it would be impossible for a 185-pound man to drink two 12-ounce beers in 1½ hours and have a resultant blood-alcohol content of .12%. Dr. Brown testified that a person of such weight would have to drink approximately six 12-ounce beers in that period of time to obtain a blood-alcohol content of .12%.

On cross-examination, Dr. Brown acknowledged that the inhalation of the chemical toleune could cause effects in the body similar to the effects caused by ingestion of alcohol. However, Dr. Brown testified that toleune and isopropyl alcohol are rapidly excreted out of the body.

Roger Wuilleimier, testifying during defendant's case in chief, stated that Reding arrived at Wuilleimier's home at approximately 5:15 p.m. Reding was returning a truck to Wuilleimier. Reding stayed at Wuilleimier's residence for approximately one hour and consumed two 12-ounce beers. Over objection, Wuilleimier testified that he had consumed alcohol with Reding in the past, and Reding's place of business is near a tavern.

Ronald Burnidge, Carol Burnidge, and Ronald Burnidge, Jr., each testified that they met with Reding at Reding's shop at approximately 7 p.m. on May 12, 1986. Both Reding and Ronald, Jr., drove an automobile that Reding was selling. Ronald, Jr., testified that Reding did nothing unusual to indicate that he was intoxicated. Additionally, Ronald and Carol also testified that they did not believe Reding was intoxicated at the time. All three witnesses testified that Reding smelled of lacquer or paint thinner. Ronald, Jr., testified that he and his parents left Reding's shop between 7:20 and 7:30 p.m.

Officer Grommes testified that when he arrived at the scene, he spoke briefly with Reding. Reding's breath smelled of alcohol, his speech was slightly slurred, his eyes were glassy, and he was "very nervous." Grommes further testified that it was his opinion that Reding was under the influence of alcohol.

The defendant requested the court to declare Grommes a hostile

witness. The court refused this request. Defendant questioned Grommes about his failure to include certain information in the police report. The State objected, and these objections were sustained.

Reding's wife, Diane, testified that when Reding entered their home immediately after the accident, she smelled only paint fumes. Reding did nothing to indicate to her that he was intoxicated. Diane further testified that she was present several days later when Reding emptied the paint out of the sprayer that he was using on May 12, 1986. Diane took a sample of the paint to Fitzsimmons & Associates for a chemical analysis. Additionally, Diane, as well as several other witnesses who had known Reding for a substantial period of time, testified that Reding's eyes are normally bloodshot.

Reding testified that he is a self-employed automobile mechanic. Reding stated that during the day of May 12, he "spot-primed" a car for painting. Reding testified that during this process he closes the door to the shop to prevent dust from getting on the car. He did not wear a mask when he "spot-primed" the car. At approximately 5 p.m. Reding went to Wuilleimier's home to return a truck he had worked on. He drank two 12-ounce beers and left at approximately 6:15 p.m.

Reding testified that he then returned to his shop and met the Burnidges. Reding and Ronald, Jr., took a car for a test drive. The Burnidges left at approximately 7:25 p.m. Reding testified that he then spray painted both sides of the back half of the car that he had primed earlier. This activity took approximately 30 to 40 minutes, and he felt no ill effects from inhaling the paint fumes.

Reding testified that he left his shop at approximately 7:45 p.m. and drove home. Reding was not wearing sunglasses, and, even though the sun was on the horizon, he could see cars traveling in the opposite direction. Reding stated that he approached his driveway, looked ahead, activated his turn signal and began to cross the left lane into his driveway. Reding did not see or hear the motorcycle. Reding heard the collision. He got out of his truck and discovered the motorcycle and rider on the ground. Reding testified that he then ran to his house and called for assistance.

Additionally, Reding testified that he complied with Officer Bumgarner's request to perform the field sobriety tests. Bumgarner then transported Reding to the police station and administered a breath test. Reding testified that he did not drive under the influence of alcohol on May 12.

On cross-examination, the State questioned Reding regarding his prior use of alcohol. Defendant objected to these questions and immediately moved for a mistrial. The objections were sustained, but the

court denied defendant's motion for a mistrial.

Reding further testified that for the past 30 years he has suffered from a condition that causes his eyes to appear bloodshot. Finally, Reding testified that after he was charged with the instant offense, he emptied the paint from the spray gun he was using on May 12 into a can, sealed it, put it in a plastic bag and labeled it.

Cynthia Peterson, an analytical chemist for R.V. Fitzsimmons & Associates, testified that in August 1986 she analyzed the can of paint which Diane Reding brought to the lab. Peterson indicated that her analysis revealed the paint sample was roughly 70% volatile—with 23% of the volatility deriving from isopropanol, 22% from toleune, 22% from acetone, 17% from methyl isobutyl ketone, and 16% from ethanol.

Marshall Dunning, a teaching assistant in the biological sciences department at the University of Wisconsin, testified that he was familiar with the blood-alcohol content Verifier breathalyzer machine. He opined that it was not a reliable or accurate means of measuring breath alcohol and equating it with the amount of alcohol in the blood. Dunning based his opinion on the fact that the breathalyzer fails to take into account the possibility that an individual's body temperature at the time he takes the test may be higher than normal. Additionally, the variation of gas distribution (the concentration of gases within the lungs) and gas diffusion (the movement of gases across the lungs) is different among individuals. Also, individual breathing patterns vary, and it is likely that persons have varying solubility ratios and not simply the 2,100:1 ratio built into the machine.

Dunning testified that he conducted a series of tests on Reding on October 14, 1986, and determined that his actual solubility ratio was 1,682:1. Additionally, there was a maldistribution of air within Reding's lungs in the amount of 8%. Dunning explained that his findings demonstrated that the .12% blood-alcohol content reported by the breathalyzer on May 12 was 28% too high, and Reding's highest possible blood-alcohol reading on that date was .0864%. Dunning further testified that while the breathalyzer screens out the chemical acetone, chemicals such as isopropanol, toleune, and methyl isobutyl ketone pass through undetected and may affect the blood-alcohol reading.

On cross-examination, Dunning indicated that he performed the tests on Reding three times and did not notice any water condensation in his syringe which may have affected his findings.

Larry Ciupik, an astronomer for the Adler Planetarium in Chicago, testified concerning an investigation he conducted to determine the location of the sun at the approximate time of the accident.

Ciupik's testimony consisted essentially of the following: the sun was very bright above the horizon prior to 8 p.m.; the sun set at 8:04 p.m.; the sun was approximately 27 degrees to the north of the point of impact; the effect of the sun was to take up the entire roadway in front of Reding; and a motorcycle headlight would be very difficult to see in the face of the sun as it appeared that day.

Merrill Allen, a professor of optometry at the University of Indiana, opined that it was virtually impossible for a reasonable and prudent motorist in Reding's position to detect the motorcycle and, thus, avoid the accident. Allen based his opinion on the following facts: the nature of Plank Road is such that the truck driver will have just adapted to the bright sun in the sky when, several hundred feet prior to the collision site, the roadway straightens, and the sun is at an angle producing glare; the driver's eyes have not yet adjusted to the new condition; the position of the sun is such that the motorcycle is indiscernible from the shadows of the trees in the background; the motorcycle headlight, while visible, would appear to the truck driver as simply a bright spot, possibly the glare of a beer can, located in the grass by the road; the truck driver's sun visor would be useless since the sun was only one or two degrees above the horizon; the inability of the truck driver to simply stop and "wait out the glare" before beginning his turn, since to do so would risk being hit from behind by another vehicle; the motorcyclist, with the sun to his back, should have had a good view of the truck driver for at least 200 feet prior to the accident; and the prudent driver, upon seeing nothing in the other lane, properly begins a turn across the opposite lane of traffic. Allen acknowledged during cross-examination that a .12% blood-alcohol content would slow reaction time, decrease observance of traffic safety, and reduce peripheral vision.

On rebuttal, Dr. Brown indicated that he reviewed Cynthia Peterson's reports concerning the chemical makeup of the paint used by Reding on May 12 and determined that the chemicals could, if inhaled in a sufficient quantity, affect the blood-alcohol reading obtained from a breathalyzer test. However, Dr. Brown noted that unless Reding experienced dizziness, severe headaches, nausea or vomiting, he would not have inhaled a significant quantity of the chemicals to interfere with the accuracy of the breathalyzer test. Brown also stated that the only way a person's solubility ratio could be less than 2,100:1 is if that individual had a significantly elevated body temperature.

During the instructions conference, the State tendered Illinois Pattern Jury Instructions, Criminal, No. 23.06 (2d ed. 1981) (hereinafter IPI Criminal 2d), which reads as follows:

"If you find that the amount of alcohol in the defendant's blood as shown by a chemical analysis of his breath was .10 percent or more by weight of alcohol, you shall presume that the defendant was under the influence of intoxicating liquor.

However, this presumption is not binding on you and you may take into consideration any other evidence in determining whether or not the defendant was under the influence of intoxicating liquor."

The court subsequently gave this instruction over defense counsel's objection.

In addition, defense counsel tendered IPI Criminal 2d No. 23.05, which states:

"A person is under the influence of intoxicating liquor when as a result of drinking any amount of intoxicating liquor his mental and/or physical faculties are so impaired as to reduce his ability to think and act with ordinary care."

The court gave this instruction without State objection.

The jury returned a verdict finding Reding guilty of the offense of reckless homicide. On April 16, 1987, Reding was sentenced to a probation term of 24 months, periodic imprisonment for four weekends, a $500 fine, and court costs. Notice of appeal was filed on May 15, 1987.

■ Defendant's first contention is that the court erred in admitting evidence of his blood-alcohol content without first determining that the testing procedures were reliable. In a reckless homicide case, the admissibility of the results of a blood-alcohol analysis is governed by the ordinary standards of admissibility. (*People v. Murphy* (1985), 108 Ill. 2d 228, 234; *People v. Durbin* (1985), 138 Ill. App. 3d 895, 898.) A particular piece of evidence is admissible if it is both relevant and material. (*People v. Miller* (1977), 55 Ill. App. 3d 136, 139.) Relevancy and materiality relate to whether the evidence offered tends to prove a disputed fact or renders the matter in issue more or less probable. (*People v. Tribett* (1981), 98 Ill. App. 3d 663, 679.) The admission of evidence is within the sound discretion of the trial court, and its decision will not be disturbed absent a clear showing of abuse of discretion. *People v. Ward* (1984), 101 Ill. 2d 443, 455-56.

In support of his contention, defendant cites *Murphy* (108 Ill. 2d 228) and *People v. Emrich* (1986), 113 Ill. 2d 343. In *Murphy*, the defendant was the driver of an automobile. As a result of an accident, a passenger in the vehicle sustained fatal injuries. The defendant was taken to a nearby hospital, and, in the course of emergency treatment for her injuries, a blood sample was taken. A chemical analysis of the

sample disclosed a certain level of alcohol in the defendant's blood. The defendant was indicted for reckless homicide and sought to suppress the results of the blood analysis. The defendant argued that since the laboratory and technicians at the hospital in question had not been certified as provided for in section 11—501.2 of the Illinois Vehicle Code (Ill. Rev. Stat. 1981, ch. 95½, par. 11—501.2), the results should not have been admissible. The court, in holding that the statutory procedures need not be followed, stated:

"The certification requirements are a protection afforded an accused to insure that the results of testing called for by law-enforcement officers in driving-under-the-influence cases are reliable. In other situations, as here, the ordinary standards of admissibility will be applied.

\* \* \*

There was no doubt in the trial judge's mind as to validity and accuracy of the testing in the hospital laboratory. He described the hospital laboratory as 'superlative' and said that it more than satisfied professional standards; that Ms. Cruz was well qualified; and that Dr. Serna was a highly trained clinical pathologist." *Murphy*, 108 Ill. 2d at 234-35.

In *Emrich*, the factual situation was similar to that presented in *Murphy*. The court reaffirmed that the statutory procedures need not be adhered to in a reckless homicide case. However, the central question in *Emrich* was the accuracy of the test performed. While the court did find that the blood sample was "spoiled" because certain preservatives were not contained in the vial used to store the sample, it could not resolve the question pertaining to the accuracy of the test. The court, citing its decision in *Murphy*, stated:

"In the absence of a finding by the trial judge on the factual question of the accuracy of Rotterman's test, this court simply has no basis for determining whether the results of that test are admissible." (*Emrich*, 113 Ill. 2d at 352.)

The court instructed the trial court to review the record, or to conduct further evidentiary hearings if needed, to determine if the test was sufficiently accurate to permit the admission of the analysis. *Emrich*, 113 Ill. 2d at 353.

■ Defendant alleges that pursuant to *Murphy* and consistent with *Emrich*, the trial court should have held a hearing to determine whether the test results were reliable since the solubility ratio built into the breathalyzer may have been different than Reding's solubility ratio. We agree with the trial court that the issue presented is a question of fact for the jury to consider. Defendant did not contest the

"accuracy" of the test as in *Emrich*. The test was not performed incorrectly. Defendant's complaint is that an assumption made in the testing procedure is not true as to Reding. Defendant has the right to cross-examine the State's witnesses as to the assumptions made in performing the test and to provide his own evidence as to the truth or falsity of those assumptions. This is an issue of fact for the jury, and the trial court did not abuse its discretion in admitting the evidence of Reding's blood-alcohol content.

Defendant's next contention is that the court erred by allowing Eric Norwood, the State's accident reconstruction expert, to testify as to the condition of the vehicles as he observed them several days after the accident. Additionally, defendant contends that the photographs of the vehicles taken by Norwood should not have been admitted into evidence as there was no testimony indicating that the vehicles were in substantially the same condition at the time the photographs were taken as they were immediately after the collision.

■ The State correctly notes that defendant did not object to this evidence at trial and did not include these contentions in his post-trial motion. Failure to object to testimony presented at trial or request that it be stricken results in waiver of the issues based upon that testimony. (*People v. Stewart* (1984), 105 Ill. 2d 22, 56.) Similarly, failure to raise an issue in a post-trial motion results in a waiver of that issue on appeal. (*People v. Enoch* (1988), 122 Ill. 2d 176, 186.) As this issue does not rise to the level of plain error (see *Enoch*, 122 Ill. 2d at 189-90), we find the issue waived and decline to address it.

Defendant also contends that Norwood was improperly allowed to testify as to his opinion regarding certain facts surrounding the collision. Specifically, defendant contends that Norwood should not have been allowed to opine that: the speed of the motorcycle prior to braking was approximately 50 miles per hour, slowing to approximately 25 miles per hour at the time of impact; the collision occurred in the eastbound lane of traffic; the use by the victim of a rusty nail instead of a cotter pin in the rear assembly of the motorcycle did not contribute to the collision; Reding's improper tactics caused the accident; the sun was not a factor; and Reding's alcohol consumption was a contributing factor in the accident. Defendant alleges that these opinions invaded the province of the jury by relieving it of its duty to make an independent determination from the facts and thus constituted reversible error.

■ The opinions of reconstruction experts may not be used as a substitute for eyewitness testimony where such is available. (*People v. Wolfe* (1983), 114 Ill. App. 3d 841, 847.) When eyewitness testimony is

available, it is within the court's discretion to permit expert testimony, and the court's decision will not be disturbed absent an abuse of discretion. (*People v. Wonders* (1985), 130 Ill. App. 3d 1, 4.) However, the use of expert testimony when eyewitness testimony is available "should be the exception and not the rule." *Wolfe,* 114 Ill. App. 3d at 847.

■ We first review the opinions presented by Norwood concerning the speed of the motorcycle both prior to braking and upon impact and the location of the collision. Initially, we note that there were no eyewitnesses to this collision. Reding testified that he did not see the motorcycle prior to impact. In fact, Reding did not know what hit him or from which direction the vehicle approached. He stated that he originally thought he was hit from the rear. Since there is no eyewitness testimony as to the speed of the motorcycle at any time prior to the collision, it was appropriate to allow expert testimony concerning this fact. See *People v. McDermott* (1985), 141 Ill. App. 3d 996, 1007-08 (due to the lack of reliable eyewitness testimony on the speed of defendant's vehicle and the point of impact, it was appropriate to allow expert testimony on these matters).

Defendant relies on *Dobkowski v. Lowe's, Inc.* (1974), 20 Ill. App. 3d 275, to support his contention that Norwood should not have been allowed to testify as to the point of impact. While the court in *Dobkowski* did state that it was error to admit the expert's opinion because the jury could easily deduce from the evidence presented where the accident occurred, the court held that this error was harmless as it did not prejudice the defendant. (*Dobkowski,* 20 Ill. App. 3d at 278.) While Reding did admit on cross-examination that the collision occurred in the eastbound lane, it was not an abuse of discretion to allow an expert to give an opinion based upon his investigation as to the point of impact. Defendant was not prejudiced in any way by the admission of this testimony.

■ In reviewing the remaining opinions presented by Norwood, we note the general rule that expert testimony on the reconstruction of an automobile accident should be allowed "where it is necessary to rely on knowledge and application of principles of physics, engineering and other sciences beyond the ken of the average juror." (*Miller v. Pillsbury Co.* (1965), 33 Ill. 2d 514, 516; see *Coffey v. Hancock* (1984), 122 Ill. App. 3d 442, 448; *Wolfe,* 114 Ill. App. 3d at 847.) A four-pronged test has been developed to determine the admissibility of accident reconstruction testimony. The four elements are:

> "(1) the testimony or opinion must be necessary,
>
> (2) the jury must be assisted by testimony regarding knowl-

edge of physics or the sciences beyond its ordinary ken,

 (3) the proffered witness must be sufficiently possessed of the requisite qualifications as an expert and

 (4) there must be sufficient physical data upon which the expert may base his conclusions and opinions." *Dobkowski*, 20 Ill. App. 3d at 277.

 ■ We now turn to Norwood's opinion that the rusty nail used in the rear assembly of the motorcycle did not contribute to the collision. Norwood's opinion that the nail in the rear assembly had nothing to do with the accident was based upon his thorough inspection of the motorcycle. Norwood reviewed the damage to the motorcycle as well as checking, *inter alia*, the brakes, cables, tire pressure, and wheels. Norwood's opinion was based on mechanical knowledge that in all likelihood is beyond the ken of an average juror. The average juror is not a motorcycle mechanic and would not know the effect of a replaced cotter pin on the rear assembly of a motorcycle. This testimony was properly admitted.

 Norwood's opinion that "the improper tactics were used in relation to turning into the driveway prior to yielding to an oncoming vehicle" was based upon his investigation of the scene of the accident, the various reports prepared by the officers responding to the accident and his inspection of the vehicles. This opinion fails the first requirement of the test. Norwood's opinion as to how the accident occurred was not necessary. Reding himself testified that he turned across the eastbound lane approaching his driveway and heard the collision. This testimony, along with the reports of the responding officers and the physical evidence testified to by Norwood, provided the jury with all the evidence needed to determine how the accident occurred. While the evidence was unnecessary, it was not prejudicial. The defendant was not prejudiced in any manner by Norwood's opinion that the accident was caused by Reding turning across the eastbound lane in front of oncoming traffic. The admission of this opinion was clearly harmless error.

 The admission of Norwood's opinion that the sun was not a factor in the accident was not prejudicial error. While Norwood's opinion was based upon his investigation of the scene and information he received from an individual at the Adler Planetarium, this opinion is not based upon knowledge of physics or sciences beyond the ken of the ordinary juror. A juror, given the location of the sun, can determine if the sun was a factor in the accident. Additionally, Norwood is not sufficiently possessed of the requisite qualifications as an expert in the area of the effects of the sun on an individual's eyesight. While it was

error for the court to allow Norwood to opine as to the effects of the sun, we do not find this error to be prejudicial. Reding admitted that although he was not wearing sunglasses, he could see the oncoming vehicles in the eastbound lane. The admission of Norwood's opinion did not prejudice Reding in any way.

■ We now turn to Norwood's opinion that alcohol consumption was a factor in the collision. In rendering an opinion, an expert must rely upon scientific theories which are generally accepted in his field. (*People v. Jordan* (1984), 103 Ill. 2d 192, 208.) Norwood's opinion that Reding's alcohol consumption was a factor in the collision is not based upon any scientific theories. Additionally, Norwood is not an expert with respect to the effects of alcohol on a person's faculties and reflexes. This is evidenced both by Norwood's lack of underlying expertise and his statement that he could not render an opinion as to what degree alcohol contributed to the accident but only, "it was a contributing factor." Norwood did not provide any basis for this opinion. Furthermore, the fact being testified to is not beyond the ken of an ordinary juror. The jury's determination of whether Reding's consumption of alcohol contributed to the collision was in no way aided by the opinion testimony of Norwood. (See *People v. Jordan* (1984), 103 Ill. 2d 192, 208 (an individual should "be permitted to testify as an expert if his experience and qualifications afford him knowledge which is not common to lay persons and where such testimony will aid the trier of fact in reaching its conclusion").) The admission of Norwood's opinion regarding the role that alcohol consumption played in the collision was error.

However, we find this error to be harmless. There was competent evidence of alcohol consumption and also of Reding's blood-alcohol content at the time of the collision. Additionally, there is evidence that a blood-alcohol content of greater than .10% would cause a person of 185 pounds to experience a loss of visual and mental acuity. Norwood did not opine that Reding's alcohol consumption "caused" the accident or amounted to recklessness. In fact, Norwood stated that he could not determine to what degree the alcohol consumption contributed to the accident. Defendant has not established that Norwood's opinion invaded the province of the jury or that it was prejudicial.

■ The next issue raised by the defendant is whether the prosecutor committed reversible error in cross-examining the defendant and others regarding his prior history of alcohol use. Initially, we note that a prosecutor cannot commit reversible error. This court is to determine if the trial court committed reversible error in its handling of any improper prosecutorial conduct.

Defendant first objects to the cross-examination of Wuilleimier concerning Wuilleimier's knowledge of defendant's drinking habits. The following exchange occurred:

"Q. I take it from your ten years' experience you knew that Mr. Reding liked to drink beer?

A. Yes.

Q. Did you know he even liked the Old Style brand?

A. Yeah, I suppose. Most people do drink Old Style. That's what I keep at the house usually.

Q. Is that Mr. Reding's brand?

A. I'd say so.

Q. Have you ever gone out and had beers with Mr. Reding?

MR. BOLON (defense counsel): Objection, your Honor, relevancy.

THE COURT: Overruled.

Q. Have you ever gone out and had beers with Mr. Reding?

A. Yeah, I probably ran into him on occasion.

Q. Where would you usually run into him, in a tavern?

A. Yes.

Q. Any particular tavern?

A. Well—.

Q. There is a tavern in Udina, isn't there?

A. Yes.

Q. Did you ever run—.

A. Yeah, I've had a beer there with him.

Q. And that tavern in Udina is right across from his business, isn't it, sir?

A. Well, it's down about a block and a half.

Q. And you don't know where the Defendant went when he left your house after having those beers, do you, sir, of your own personal knowledge?

A. No, not really, I don't know."

It is clear in Illinois that the latitude to be accorded in cross-examination rests largely in the trial court's discretion, and only in a case of clear abuse of discretion resulting in manifest prejudice to a defendant will a reviewing court interfere. *People v. Gallo* (1973), 54 Ill. 2d 343, 356.

Defendant claims the prejudice that resulted from the above exchange was that the jury was informed the defendant frequented a bar close to his place of business. Defendant contends the jury may have determined the crucial issue of Reding's "condition" at the time of the accident from this irrelevant information.

We disagree. Defendant told Officer Bumgarner at the accident scene that he had "a couple of beers at a local tavern." Wuilleimier testified that he did not know where Reding went after he left Wuilleimier's home. The questions pertaining to Reding frequenting a local tavern near Reding's business do relate to the possible consumption of alcohol prior to the accident. We do not find that the court clearly abused its discretion in allowing this line of cross-examination. Additionally, if an abuse of discretion did occur, it did not result in manifest prejudice to the defendant.

Defendant also assigns error to the following exchange that occurred during cross-examination:

"Q. Well, it's true, Mr. Reding, you first consumed alcohol at the age of fourteen?

MR. BOLON: Objection.

THE WITNESS: Fourteen?

MR. BOLON: Objection, your Honor.

THE COURT: Sustained.

MR. HIGGINS (Assistant State's Attorney): Your Honor, I believe I can develop this man's history of use of alcohol.

MR. BOLON: I object to that.

MR. HIGGINS: This is cross examination.

THE COURT: I have sustained the objection. Go ahead.

Q. Mr. Reding, do you consider yourself a regular consumer of alcohol?

A. No, sir.

Q. So, it would be incorrect that you began to—began drinking on a regular basis—

MR. BOLON: Objection, your Honor, I object. In fact, I would like to—to be heard, Your Honor.

(WHEREUPON the following side bar discussion was held outside the hearing of the Jury.)

MR. BOLON: I object to this line of questioning, your Honor. I move for a mistrial. The—The bringing of this information is highly prejudicial and not relevant to this case, your Honor.

MR. HIGGINS: I think alcohol consumption and the pattern or use is certainly relevant.

MR. BOLON: What—How is it relevant as to whether or not on May 12th, 1986—.

THE COURT: I will sustain the objection."

Defendant claims that this exchange was highly prejudicial and his conviction should be reversed because of it.

Defendant immediately objected to the question posed by the State. The court correctly sustained this objection and, after a sidebar, confirmed this ruling. Reding did not answer the question regarding the age at which he first consumed alcohol. The court promptly sustained defendant's objection to the question thus curing any error that may have occurred. See *People v. Outlaw* (1979), 75 Ill. App. 3d 626, 646.

Defendant next contends that the court erred by not allowing Dorko, the breathalyzer technician, to be cross-examined regarding tests performed on the breathalyzer eight months after it was used to test Reding. Again, we note that the latitude accorded during cross-examination is within the sound discretion of the trial court. *Gallo*, 54 Ill. 2d at 356.

Defendant claims that the tests performed on the breathalyzer using chemicals similar to those found in the paint used by Reding are relevant and admissible. The court found that these test results were irrelevant because the tests were conducted approximately eight months after the breathalyzer was used to test Reding. Additionally, the machine was tested with a solution containing alcohol approximately two weeks prior to and two weeks after the testing of Reding. We find that the court did not abuse its discretion in refusing to allow cross-examination concerning the tests conducted eight months after the test of Reding.

Defendant next contends that the court erred by refusing to allow him to impeach Officer Grommes concerning Grommes' failure to include certain information in the accident reports. During the cross-examination of Grommes, the following exchange took place:

"Q. After you did that, sir, what did you do?

A. After the paramedics arrived, they immediately went to the subject that was laying in the driveway. I went and—went over and talked to the subject that was—that was standing in the driveway when I arrived.

Q. And was that—would that have been the defendant, Don Reding?

A. That's correct.

Q. What was he doing at that time, sir?

A. He was standing approximately twenty or thirty feet away from where the subject was lying, just kind of observing what was going on.

Q. By the way, sir, when you arrived there, was it—was it dark out?

A. It was just starting to get dark at that time.

Q. So—Well, when you say it was starting to get dark, could you—would you say it was dusk?

A. I would call it dusk.

Q. Now, sir, when you—when you—you filled out a police report in this case, did you not, sir?

A. Yes, I did.

Q. And you didn't put down it was dusk out, did you, sir?

MR. HIGGINS (Assistant State's Attorney): Judge, I object. I would like to be heard.

(WHEREUPON the following side bar discussion was had outside the hearing of the Jury.)

MR. HIGGINS: Judge, this is not a surprise witness, he is not allowed to impeach his own witness.

THE COURT: All right. Sustained.

* * *

Q. Sir, did you at any time examine the body of the victim other than when you first got there?

A. No, I did not.

Q. When you first got there and you observed the victim, what was his apparent physical condition, sir?

A. I would call it serious to critical.

Q. And, sir, did you make out a report in connection with this case?

A. Accident report?

Q. Yes.

A. Yes, I did.

Q. And in that report you put down all the information relative to the accident, did you not, sir?

A. I believe I did.

Q. And on that report, sir, did you indicate his condition was normal?

MR. HIGGINS: Objection, Your Honor.

THE COURT: Sustained.

MR. BOLON: Well, Judge, may I be heard?

(WHEREUPON the following side bar discussion was had outside the hearing of the Jury.)

MR. HIGGINS: The basis of my objection is, Judge, he's not allowed to impeach his own witness. This is not surprise testimony.

THE COURT: I don't know where it is you are headed with this, counsel.

MR. BOLON: Judge, number one, under Supreme Court

Rule 238 I can have a witness called that I don't—I don't vouch—and the case law as to I don't vouch for the police officer or any other witness merely because of the fact that I call him. In addition to that, sir, if he testifies differently than that—than things he had done before, I am caught by surprise by that and I can—.

THE COURT: I will sustain the objection. Let's go."

Defendant is correct in that the credibility of a witness may be attacked by any party. (107 Ill. 2d R. 238(a).) When there has been a material omission of facts contained in a prior statement from later testimony, it is logical that the fact of omission should be admissible. (*People v. Henry* (1970), 47 Ill. 2d 312, 321.) Conversely, the omission of a fact, under circumstances rendering it unlikely that the fact would have been omitted, if true, may be shown to impeach the witness as to that fact. *People v. Gonzalez* (1983), 120 Ill. App. 3d 1029, 1038.

 Defendant argues that Grommes' credibility was a crucial issue in the case. We disagree. The contention that it was "dusk" at the time of the accident is not a definitive fact that, under the circumstances, would have been likely to be included in the report. The officer did provide the time of the accident in his report. Furthermore, the court's refusal to allow defendant to show that Grommes indicated in his report that the condition of the victim was normal when in fact he was quite serious does not appear to be an abuse of discretion. The fact that Grommes wrote "normal" on his police report and later testified that the victim was critical may relate to a poor diagnosis but does not necessarily impeach his powers of observation. The victim's condition was not at issue in this case. It is the condition of defendant that is of importance. There was sufficient evidence indicating that Reding had consumed alcohol. Reding admitted this fact. Wuilleimier and Bumgarner both provided evidence on this fact. The credibility of Grommes was not a crucial issue in this case. We find that the court did not abuse its discretion in refusing to allow defendant to impeach Grommes concerning these facts and, if so, the error was not prejudicial.

Defendant's next contention is that the court erred in giving the jury IPI Criminal 2d No. 23.06. The instruction as given stated:

"If you find that the amount of alcohol in the defendant's blood as shown by a chemical analysis of his breath was .10 percent or more by weight of alcohol, *you shall presume* that the defendant was under the influence of intoxicating liquor.

However, this presumption is not binding on you and you

may take into consideration any other evidence in determining whether or not the defendant was under the influence of intoxicating liquor." (Emphasis added.)

Defendant claims that the use of the phrase "you shall presume" renders the instruction improper. Defendant argues that this instruction could reasonably be interpreted by the jury to improperly create a conclusive presumption or a burden-shifting presumption. Therefore, defendant alleges that his due-process rights were violated.

Defendant, while objecting to the instruction given, did not tender an instruction setting forth his interpretation of the law. It is defendant's duty to tender at trial a proper instruction on a particular issue, and the failure to do so will preclude him from raising objections to the given instruction on appeal. (*People v. Smith* (1978), 71 Ill. 2d 95, 104.) However, if the interests of justice require, substantial defects in jury instructions in criminal cases are not waived by failing to object properly. (107 Ill. 2d R. 451 (c).) This exception to the waiver rule exists to correct grave errors or to correct errors in cases where the evidence is so closely balanced that fundamental fairness requires the jury to be properly instructed. *People v. Reddick* (1988), 123 Ill. 2d 184, 198.

Jury instructions should not be misleading or confusing. (*People v. Gathings* (1981), 99 Ill. App. 3d 1135, 1138.) The purpose of an instruction is to guide the jury in its deliberations and to aid it in reaching a proper verdict. (*People v. Hester* (1989), 131 Ill. 2d 91, 98.) Presumptions and inferences are evidentiary substitutes for the facts inferred. (*People v. Housby* (1981), 84 Ill. 2d 415, 418.) An instruction that can be reasonably interpreted as creating a conclusive or persuasion-shifting presumption with respect to an element of an offense is unconstitutional and cannot be used. *People v. Frazier* (1984), 123 Ill. App. 3d 563, 573.

In *People v. Malik* (1983), 113 Ill. App. 3d 206, the court had an opportunity to review IPI Criminal 2d No. 23.06. The court, while not specifically ruling upon the propriety of the instruction, stated:

"[T]he contradiction between the two paragraphs raises at least a close question as to whether the jury might be so confused as to think the presumption was either mandatory or such as to place a burden on the defendant to prove his sobriety." *Malik*, 113 Ill. App. 3d at 211.

The most recent review of IPI Criminal 2d No. 23.06 was undertaken in *Hester*. In *Hester*, the defendant was charged with reckless homicide. The State proposed and, over the defendant's objection, the court gave a modified version of IPI Criminal 2d No. 23.06. The State

modified the instruction to read "you *may* presume" as opposed to, "you *shall* presume." (Emphasis added.) The court was asked to rule upon whether the modification was an improper example of judicial legislation. The court, citing several appellate court decisions, stated:

"These cases indicate that IPI Criminal 2d No. 23.06 does not fairly state the law. As such, under the rules of this court, the trial court was authorized to modify the jury instruction." (*Hester*, 131 Ill. 2d at 103.)

The court did not, however, discuss whether the giving of IPI Criminal 2d No. 23.06 without modification would have constituted grave error.

In *Frazier*, the defendant was charged with driving while under the influence of alcohol, and IPI Criminal 2d No. 23.06 was given to the jury. Defendant argued that since the instruction used the language "you *shall* presume," it created an impermissible presumption of intoxication. The court noted that the first paragraph of the instruction could have the effect of either shifting the burden of persuasion or, more likely, to conclusively establish the defendant's intoxication. Either of these effects is improper. (*Frazier*, 123 Ill. App. 3d at 573.) The court also noted that the second paragraph of the instruction allowed the jury to disregard the presumption and to consider other evidence instead. The court resolved this inconsistency by stating:

"Viewed separately, the two paragraphs are inconsistent: the apparent command of the first is contradicted in the second. But one visible basis for resolving the contradiction is provided by the sequence of the paragraphs, from which the jury here might reasonably have concluded that the second controlled simply because it was later and broader. Furthermore, whatever confusion arose from this instruction was dispelled by the other instructions. The jurors were given a thorough explanation of their independent role in weighing the evidence and determining questions of fact. The jurors were also told that the defendant was presumed to be innocent of the charge, that the State had the burden of proving his guilt beyond a reasonable doubt, and that that burden remained with the State throughout the trial. Finally, the issues instruction said that the State had to prove beyond a reasonable doubt each of the propositions constituting the [charge]. The instructions as a whole cured the error contained in that one paragraph in the instruction on the presumption." *Frazier*, 123 Ill. App. 3d at 573-74.

We acknowledge that IPI Criminal 2d No. 23.06 as it existed

at the time of this case may be confusing. The language of the first paragraph is inconsistent with that of the second paragraph. However, this case is similar to *Frazier* in that the court instructed the jury that it was within the jury's province to decide questions of fact. Also, the jury was instructed as to the presumption of innocence and the State's burden to prove each element of the charge beyond a reasonable doubt. The jury received a proper instruction regarding the elements of reckless homicide. The instructions must be construed as a whole and not viewed in isolation. (*Housby*, 84 Ill. 2d 433-34; *People v. Morrison* (1985), 138 Ill. App. 3d 595, 599.) The instructions in the instant case, when viewed as a whole, informed the jury that it was not bound by any presumptions, nor did the burden of proof shift to defendant. We find that even though IPI Criminal 2d No. 23.06 as it existed was not entirely clear, the giving of this instruction in conjunction with the other instructions did not constitute grave error. Since defendant did not properly preserve this issue for review, this issue is waived.

Defendant next argues that he received ineffective assistance of counsel because his attorney tendered IPI Criminal 2d No. 23.05. This instruction states:

"A person is under the influence of intoxicating liquor when as a result of drinking any amount of intoxicating liquor his mental and/or physical faculties are so impaired as to reduce his ability to think and act with ordinary care."

Defendant contends that by tendering IPI Criminal 2d No. 23.05 defense counsel allowed the jury to convict Reding upon lesser proof than had the instruction not been given.

To establish ineffective assistance of counsel, defendant must show that his attorney's representation fell below an objective standard of reasonableness and that "but for" his attorney's conduct, there is a reasonable probability that the outcome would have been different. *Strickland v. Washington* (1984), 466 U.S. 668, 688, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064.

Defendant cites *People v. Lemcke* (1980), 80 Ill. App. 3d 298, for the proposition that the tendering of an improper instruction can result in ineffective assistance of counsel. However, in *Lemcke*, the error in the instruction allowed defendant to be convicted under a lesser standard of intent than was required under the information.

The case at bar contains no such error. Defendant incorrectly states that to sustain a conviction without the questioned instruction, the State would have had to establish that Reding's blood-alcohol content was over .10%. This is not true. An element of

reckless homicide is that the defendant must be shown to have operated a motor vehicle in a reckless manner. (See *People v. Walljasper* (1981), 97 Ill. App. 3d 81, 82.) The State was relying on the fact that Reding was under the influence of intoxicating liquor at the time of the collision to establish recklessness. The State was not relying on the fact that Reding's blood-alcohol content was over .10% to establish recklessness. Reding's blood-alcohol content was simply one piece of evidence used to establish that Reding was under the influence. The State relied on the officers' testimony as to their observations and the results of the field sobriety tests. The State also presented evidence to establish that Reding had in fact consumed alcohol prior to the accident. All of these facts were used to establish "under the influence" and thus recklessness. The jury was instructed that it must find recklessness beyond a reasonable doubt. The giving of IPI Criminal 2d No. 23.05 did not allow defendant to be convicted by lesser proof. Defendant has not established that his attorney's conduct fell below an objective level of reasonableness and "but for" his attorney's conduct the outcome would probably have been different.

Finally, defendant's last contention is that he was not proved guilty beyond a reasonable doubt. Defendant argues that the evidence was insufficient to establish beyond a reasonable doubt that he was reckless and his conduct was likely to cause death or great bodily harm.

A person commits reckless homicide if he kills another while driving a motor vehicle and the acts which cause death are such as are likely to cause death or great bodily harm and are performed recklessly. (*Walljasper*, 97 Ill. App. 3d at 82.) A person is reckless when he consciously disregards a substantial risk that his actions are such that they are likely to cause death or great bodily harm, and where such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in such a situation. (*People v. Bonzi* (1978), 65 Ill. App. 3d 927, 931.) Whether the given conduct is "reckless" for the purpose of finding a driver guilty of reckless homicide is a factual question for the trier of fact to decide. (*People v. Dunnegan* (1987), 151 Ill. App. 3d 973, 982.) A court of review will not disturb a jury's verdict unless the evidence presented is improbable or so palpably contrary to the verdict as to create a reasonable doubt of guilt. *People v. Hawn* (1981), 99 Ill. App. 3d 334, 338.

We find that there was sufficient evidence presented from which the jury could have found defendant guilty of reckless homicide beyond a reasonable doubt. The jury was presented with evidence that

450

Reding was driving while intoxicated at the time of the collision. Additionally, it was shown that Reding turned his vehicle in front of oncoming traffic. This action caused the collision and Miraglia's death. This evidence is not palpably contrary to the finding of "recklessness" reached by the jury. We find that the defendant was proved guilty beyond a reasonable doubt.

For these reasons the judgment of the circuit court of Kane County is affirmed.

Affirmed.

UNVERZAGT, P.J., and REINHARD, J., concur.