THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RICHARD RUSHTON, Defendant-Appellant.

Second District    Nos. 2—92—0852, 2—92—0978 cons.

Opinion filed December 8, 1993.—Rehearing denied February 10, 1994.

G. Joseph Weller and Thomas A. Lilien, both of State Appellate Defender's Office, of Elgin, for appellant.

Michael J. Waller, State's Attorney, of Waukegan (William L. Browers, Robert J. Biderman, Shirley M. Bagby, Denise M. Ambrose, and Martin P. Moltz, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE DOYLE delivered the opinion of the court:

Defendant, Richard Rushton, was convicted of reckless homicide (Ill. Rev. Stat. 1991, ch. 38, par. 9—3 (now codified, as amended, at 720 ILCS 5/9—3 (West 1992))) following a jury trial in the circuit court of Lake County. Defendant was sentenced, pursuant to section 9—3(e) of the Criminal Code of 1961 (Ill. Rev. Stat. 1991, ch. 38, par. 9—3(e) (now 720 ILCS 5/9—3(e) (West 1992))), under the enhancement provision applicable when a defendant is found to be under the influence of alcohol or drugs at the time of committing the offense of reckless homicide. The trial court imposed a sentence of five years' imprisonment. Defendant raises the following issues on appeal: (1) whether it was plain error for the trial court to allow testimony from the State's accident reconstruction expert; (2) whether it was plain error for the trial court to allow testimony and the admission of a hospital report concerning a blood-alcohol test of defendant; (3) whether defendant was denied a fair trial as a result of various comments made by the prosecutor during closing arguments; (4) whether defendant was denied a fair trial as a result of ineffective assistance of counsel; (5) whether it was error for the trial court to sentence defendant under the enhancement provision of section 9—3(e) without having instructed the jury that intoxication was an element of the charged offense; and (6) whether the enhancement provision of section 9—3(e) is unconstitutional.

The relevant facts are as follows. At or around 11:30 p.m., on October 12, 1991, defendant was operating an Eagle Talon northbound on Kelsey Road. Near the intersection of River Road and Kelsey Road, defendant's vehicle collided head-on with a southbound BMW driven by decedent. Decedent had been transporting her sister to a hospital in Barrington, and the sister had no memory of the events leading up to the collision. Kelsey Road is a two-lane highway. In the vicinity of the accident, Kelsey Road runs through a rural area and is dark and surrounded by trees. The lanes are separated by double yel-

low lines, and the posted speed limit is 45 miles per hour. On the night of the accident the weather was warm, dry, and clear.

At trial, the State offered testimony of John Hill, Jr., who stated that he had been traveling northbound on Kelsey Road on October 12, 1991. He testified that he had noticed a car behind him come up within five feet of his rear bumper. Hill testified that the vehicle made two attempts to pass his car but pulled back behind him on both occasions. The car then dropped back a distance from Hill's vehicle. As he drove on, Hill encountered another vehicle traveling southbound on Kelsey Road. This vehicle did not cross into Hill's lane of traffic. However, Hill testified that once the vehicle passed he looked in his rearview mirror and saw its brake lights illuminate and the car swerve "just a bit." Hill stated that at this point he could not see the headlights of the vehicle in back of him. Hill subsequently observed a head-on collision between the two vehicles while looking in his rearview mirror. Hill estimated that the collision occurred 80 to 120 feet behind his car.

The State presented expert testimony from Roger Barrette, an officer with the Lake County sheriff's department. Radiator fluid was found at the accident scene running from just west of the center line to under the BMW and onto the east shoulder of the road. Barrette identified this fluid as coming from the BMW's radiator. Tire scuff marks were found running from near the center line to the left front tire of the BMW. Barrette testified that these marks resulted from heat generated as the BMW's left front tire was forced into the pavement. Barrette also stated that four gouge marks found in the road west of and near the center line resulted from metal being forced into the pavement. Barrette testified that three of the gouge marks had been made by the BMW while one of the gouge marks had been made by the catalytic converter from defendant's Eagle Talon. Barrette opined from these observations that defendant's vehicle had been 57 inches over the center line into the southbound lane at the time of impact. He also determined that neither vehicle had been exceeding the speed limit at the time of impact. Barrett admitted, however, that his analysis could only conclude what had happened in the last 5 to 10 feet before the collision.

Barrette noted that most of the debris from the accident had been found in the northbound lane. He testified that the steering wheel on the BMW was found to be a quarter or a half turn to the left. Barrette stated that the BMW had ended up in the northbound lane after the crash due to some easterly movement by the BMW just before impact, such as would result from a swerve, and this was consistent

with the position of its steering wheel. Barrette also determined that the headlights of both vehicles had been on at impact, and the brakes and tires of both vehicles were in good condition.

Richard Gluth, Jr., a paramedic with the Village of Barrington fire department, testified that his ambulance responded to the October 12 accident. Gluth stated that he had been the primary treating paramedic for defendant. Defendant was removed from his vehicle, and Gluth's ambulance transported him to Good Shepherd Hospital. During transport, defendant was given two intravenous (IV) solutions of lactated ringers to replace his fluids and stabilize his blood pressure. Gluth testified that the IVs do not contain alcohol. Gluth testified that Michael Wahl, a paramedic with the Village of Wauconda fire department, accompanied the ambulance when it left the scene. Wahl testified that he drove the ambulance with defendant to the hospital.

Dr. Susan Kanehann, an emergency room physician, was on duty when defendant was brought in. She testified that defendant's case was classified as "Code T," indicating a trauma patient with serious, potentially life-threatening injuries. Kanehann said that this classification is used to determine whether to call in certain hospital personnel to help with the case. Kanehann testified that defendant went through X rays and a CAT scan after he arrived at the hospital, and she also ordered blood and urine tests. She described how the results of these tests, which include a determination of blood-alcohol concentration (BAC), were used for purposes of diagnosis and treatment. Kanehann stated that the tests were performed, and she received the results of the blood test initially over the telephone and then in the form of a computer printout which she put on defendant's chart. Kanehann received this written report while defendant was still in the emergency room, and she used these test results for purposes of his diagnosis and treatment. These results included the defendant's BAC, which she recalled as being 257 milligrams per deciliter (.257). Kanehann also testified that she had detected an odor of alcohol on defendant's breath, but she admitted that she did not note it in her report.

Kanehann testified that when she receives an emergency room printout, she writes the results onto the patient's chart, and the printout is subsequently thrown away. The face sheet from defendant's emergency room patient chart was identified by Kanehann. Kanehann verified that the test results were written, in her handwriting, on the face sheet. A cumulative summary of defendant's medical records was also identified by Kanehann. This report indicated that it was printed at 6:53 p.m. on October 23, 1991, and it also contained the results of

defendant's blood test. The emergency room printout with defendant's blood-test results was not introduced at trial.

Leslie Buck, a medical technologist, testified that she was on duty when defendant was brought to the hospital. Buck testified that she is responsible for gathering blood-drawing equipment and going to the emergency room as quickly as possible, when a patient is categorized as "Code T." She arrived with her tray of equipment before defendant was brought in to the hospital. Buck testified that Dr. Kanehann instructed her to perform tests on defendant pursuant to a standard trauma protocol, which includes a blood-alcohol test. Buck testified that she cleaned a site on defendant's right arm with an iodine solution which contains no alcohol and then she drew a sample of blood from that site. Buck stated that defendant did not have an IV in his right arm. Buck described how she later tested this sample and determined the BAC of defendant's blood serum to be .257. Buck testified that she then telephoned the results of her test to the emergency room staff and then entered and accepted the results into the hospital's computer. Buck stated that after she had completed entering the results into the computer, they could be immediately printed out in the emergency room. Buck testified that this printout is a temporary one, which is placed with the patient's chart until a permanent summary of the patient's medical records is printed. Buck added that patients' permanent medical summaries are generated twice a day by the hospital computer, and older summaries and temporary printouts are then disposed of to conserve space in the hospital's files. Buck stated that the test results were included in defendant's permanent summary, in addition to any subsequent test results.

Patricia Skaja, a staff nurse, testified that she was working in the hospital's emergency room when defendant was brought in. She testified that he smelled of alcohol at the time and that he would not cooperate with the hospital staff when asked questions about his medical history.

Jeorg Pirl, a toxicologist with the State of Illinois Department of Public Health, gave expert testimony regarding intoxicants and their effects. Pirl testified that blood serum measurements of BAC are 18% higher than whole blood measurements. Based on this fact, he calculated that the results of the hospital's test of defendant's blood serum BAC were equivalent to a whole BAC of 218 milligrams per deciliter (.218). Given defendant's sex, weight, and height, Pirl opined that he would have had to have consumed a minimum of 11 to 12 standard drinks (i.e., drinks containing an amount of alcohol equivalent to one can of beer or a glass of wine) to achieve that BAC. Pirl also testified

that IV solutions could have a dilutive effect on an individual's BAC if they were given in large quantities, but a simple maintenance solution, such as those given to defendant, would have very little effect. Pirl added that if the maintenance solution given to defendant had any effect, it would have caused a lower BAC reading.

Joan Rembacz, a staff nurse, testified that she worked in the hospital's intensive care unit and treated defendant after he was brought over from the emergency room. When she spoke with defendant, she noticed a "pretty strong" odor of alcohol on his breath, and she stated that his speech was not very clear, as if he was eating something or had cotton in his mouth. Rembacz testified that defendant admitted frequently using alcohol. He also told her that he remembered that a car had come at him and that he had gone to the hospital, but he did not remember other details of the event.

Defendant testified that he had been driving home on Kelsey Road on the evening in question. He stated that he had considered passing Hill's car twice, but had not done so on the first occasion because he could not see far enough ahead. When he tried the second time, defendant saw an oncoming car a good distance away. Defendant stated that he decided not to pass Hill's car because they were approaching an intersection. Instead, he dropped back behind Hill intending to light a cigarette. Defendant stated that after the oncoming car passed Hill's vehicle, it began drifting steadily toward his lane and crossed the center line. Defendant testified, "I took evasive action. The vehicle came into my lane. I took evasive action to the left. The vehicle then veered directly towards me, and there was impact." Defendant stated that Hill's car was 150 feet ahead of his at the time of the impact.

Defendant testified that the only alcoholic drinks he consumed that day were two cans of beer which he drank between 1 and 2 p.m. and a third which he drank at around 6:30 p.m. Defendant admitted that he told the nurses at the hospital that he remembered nothing about the accident. He testified that this response had been truthful at the time but that he had since been able to recall some of what had happened. Defendant denied telling the nurse that he was a frequent drinker. Defendant also testified that the nurse drew blood from his left arm. Afterwards the nurse informed him that he had a .257 BAC, and he responded that he thought it was nonsense and he would not speak to anyone until he spoke to an attorney.

Defendant was convicted on one count of reckless homicide. The trial court sentenced defendant under the Class 2 felony provision for reckless homicide cases involving a defendant who has acted under

the influence of alcohol or drugs. The trial court imposed a term of five years' imprisonment.

The first issue defendant raises concerns whether it was error for the trial court to permit Barrette to testify that the point of impact was in decedent's lane. In particular, defendant argues that because eyewitness testimony was available from Hill and defendant, Barrette's testimony as an accident reconstruction expert should not have been admitted. Defendant acknowledges that this issue has been waived because no related objection was raised at trial (see *People v. Williams* (1990), 139 Ill. 2d 1, 14; *People v. Enoch* (1988), 122 Ill. 2d 176, 186-87; *People v. Steffens* (1991), 208 Ill. App. 3d 252, 263), but urges that we review the question under the plain error doctrine (134 Ill. 2d R. 615(a)). The plain error rule permits a reviewing court to consider issues which have been waived by an accused (1) where the evidence is closely balanced, or (2) where the error is so fundamental and of such a magnitude that the accused was denied a fair trial. (*People v. Lucas* (1992), 151 Ill. 2d 461, 482; *People v. Herrett* (1990), 137 Ill. 2d 195, 209-10; *People v. Markiewicz* (1993), 246 Ill. App. 3d 31, 39.) Our review of the record indicates that the evidence was not closely balanced, but, because the point of impact was a critical issue disputed in this case and because Barrette's testimony on this point was crucial to the determination of that issue, we agree that if error occurred it would have been of such a magnitude as to risk depriving defendant of a fair trial. We will therefore review the question under the doctrine of plain error.

It has been generally stated that opinions of reconstruction experts may not be used as a substitute for eyewitness testimony where such testimony is available. (*Palmer v. Craig* (1993), 246 Ill. App. 3d 323, 327; *People v. Reding* (1989), 191 Ill. App. 3d 424, 437.) However, expert testimony on the reconstruction of an automobile accident should be permitted in addition to eyewitness testimony where it is necessary to rely on knowledge and application of principles of physics, engineering, and other sciences beyond the ken of the average juror. (*Palmer*, 246 Ill. App. 3d at 327; *Reding*, 191 Ill. App. 3d at 438.) A trial court's decision in this regard will not be disturbed absent an abuse of discretion. *Reding*, 191 Ill. App. 3d at 437-38.

In *Reding*, which both parties rely upon, this court recognized and applied a four-part test for determining the admissibility of accident reconstruction testimony. (See *Reding*, 191 Ill. App. 3d at 438-39.) The application of this test, which attempts to reconcile a broad rule riddled with exceptions, has caused considerable difficulty. (See *Palmer*, 246 Ill. App. 3d at 327.) In *Augenstein v. Pulley* (1989), 191

Ill. App. 3d 664, *appeal denied sub nom. Augenstein v. Steinmetz* (1990), 131 Ill. 2d 557, an extensive analysis was made of the use of expert testimony in reconstructing automobile accidents, and a new rule was derived:

> "[T]he admissibility of reconstruction evidence is to be determined upon the rules announced by the supreme court for opinion evidence. Is the expert qualified in the field, and will his testimony aid the fact finder in the resolution of the dispute? If the answer to these two questions is in the affirmative, then the testimony is admissible. The presence or absence of eyewitnesses thus becomes not the sole criterion for the determination of admissibility of reconstruction testimony, but only one of the criteria, and it obviously applies only to the second of the questions dealing with the admissibility of the testimony." (*Augenstein*, 191 Ill. App. 3d at 681.)

The *Augenstein* rule has been subsequently adopted in a number of civil and criminal cases. See *Palmer*, 246 Ill. App. 3d at 327; *Robles v. Chicago Transit Authority* (1992), 235 Ill. App. 3d 121, 138; *People v. Mancinelli* (1992), 232 Ill. App. 3d 211, 219; *Loseke v. Mables* (1991), 217 Ill. App. 3d 521, 524.

■■ Initially, it is noted that defendant has not questioned Barrette's expert qualifications. Thus, we need only determine whether his testimony would have aided the jury in resolving the dispute before it. Barrette testified concerning his observations at the accident scene and identified various items of physical evidence, such as the gouge and tire marks on the roadway. Using his expertise, he was able to identify the physical cause of these markings. We find this testimony to have been relevant and of potential assistance to the jury because it involved matters beyond the knowledge and experience of the ordinary juror. Barrette's ultimate opinion, that defendant's vehicle was approximately 57 inches across the center line into the southbound lane, was based upon this physical evidence. Given defendant's inconsistent statements regarding his memory of the accident and the fact that Hill's observations were made through a rearview mirror about 80 to 120 feet away, the jury might well have concluded that there was no reliable eyewitness as to the location of the vehicles at the point of impact. Barrette's testimony interpreting the physical evidence might have aided the jurors in that determination. We conclude, therefore, that it was not plain error for the trial court to have admitted Barrette's testimony concerning the location of the vehicles at the point of impact.

The next issue is whether it was error for the trial court to permit the use of the results of defendant's BAC test. Defendant argues that (1) the State presented an improper foundation for the introduction of the test results by failing to offer testimony identifying the type of cleansing agent used to prepare defendant's arm prior to receiving the IV solutions of lactating ringers, and (2) defendant's permanent medical summary, rather than the actual emergency room printout, was erroneously introduced at trial. Defendant acknowledges that both questions might be deemed waived because trial counsel failed to object to the foundation for admission of defendant's BAC and because trial counsel failed to preserve his objection to the admission of the medical summary by raising the issue in post-trial motions. Defendant urges, however, that these points be reviewed under the plain error rule. As previously noted, our review of the record indicates that the evidence was not closely balanced, particularly on the question of defendant's intoxication. We will, however, review the issues because the question of intoxication was central to the controversy, and if error occurred it would have been of such a magnitude as to risk depriving defendant of a fair trial.

■ We find defendant's initial challenge to the admission of his blood-alcohol test results to be unsupported by the law. Defendant relies on *People v. Miller* (1988), 166 Ill. App. 3d 155, to support his position that the State was required to provide direct evidence that the cleansing agents used when the IVs were administered could not have affected defendant's blood-test results. Because the State was required to demonstrate the accuracy of defendant's blood test, it was therefore necessary for the State to establish a basic foundation to prove the accuracy of the test. (*Miller*, 166 Ill. App. 3d at 158.) *Miller* held that, although there is no general requirement that the State show that a defendant was not given treatment or medication which would have affected his test results, where a defendant is administered medication or treatment during or shortly before a blood test, the State must prove that the prescribed treatment or medication did not affect the accuracy of the test. (*Miller*, 166 Ill. App. 3d at 158.) Pirl's testimony demonstrated that the only effect the IV solutions might have had on defendant's blood test would have been to lower the actual test result. Buck gave considerable testimony about how defendant's blood was drawn and tested. She specifically noted that the arm from which she drew blood did not have an IV in it, and she used a nonalcoholic cleansing and disinfecting agent to cleanse the site on defendant's arm before she drew the blood. We would have to ignore the testimony and indulge in speculation to accept defendant's

suggestion that the cleansing agent used when the IVs were administered could have affected a subsequent blood test taken from a different puncture site. We conclude that the State provided a sufficient foundation for the introduction of defendant's blood test, and the accuracy of that test was properly for the jury to resolve.

Defendant also challenges the admission of the written results of defendant's blood test under section 11—501.4 of the Illinois Vehicle Code (Ill. Rev. Stat. 1991, ch. 95½, par. 11—501.4 (now 625 ILCS 5/11—501.4 (West 1992))). Two writings were offered which contained these results. First, the results were contained in defendant's permanent medical summary, generated 10 days after the blood test was done, and, second, the results were indicated on the face sheet from defendant's emergency room patient chart. Defendant raised objections to the admission of both writings. The trial court ruled that the written test results were admissible, but granted defendant's motion to exclude the face sheet because admitting the test results through the summary was the "least harmful for the defendant." Section 11—501.4 of the Illinois Vehicle Code provides, in part:

"§11—501.4. Admissibility of written blood alcohol test results conducted in the regular course of providing emergency medical treatment. (a) Notwithstanding any other provision of law, the written results of blood alcohol tests conducted upon persons receiving medical treatment in a hospital emergency room are admissible in evidence as a business record exception to the hearsay rule only in prosecutions for *** reckless homicide brought under the Criminal Code of 1961, when each of the following criteria are met:

(1) the blood alcohol tests were ordered by a physician on duty at the hospital emergency room and were performed in the regular course of providing emergency medical treatment in order to assist the physician in diagnosis or treatment;

(2) the blood alcohol tests were performed by the hospital's own laboratory; and

(3) the written results of the blood alcohol tests were received and considered by the physician on duty at the hospital emergency room to assist that physician in diagnosis or treatment." Ill. Rev. Stat. 1991, ch. 95½, par. 11—501.4 (now 625 ILCS 5/11—501.4 (West 1992)).

Defendant argues that the summary was "not *the* written result received and considered by the doctor in treating and diagnosing defendant. The document which would have been admissible under section 11—501.4 was the computer printout which was discarded.

Moreover, Dr. Kanehann's testimony indicated that she treated the defendant on the basis of the information received by phone through a nurse. The record does not establish that the *written* results were even utilized by the doctor." (Emphasis in original.) We reject defendant's contention that the written results were not used as part of treatment. Although Kanehann testified that she initially received defendant's test results over the telephone, she clearly stated that she also received the written printout while she was treating defendant and that she used the information in that printout for purposes of his treatment and diagnosis. The cases relied upon by defendant, *People v. Reardon* (1991), 212 Ill. App. 3d 44, and *People v. Mueller* (1991), 221 Ill. App. 3d 234, are therefore inapposite to this case. In *People v. Ethridge* (1993), 243 Ill. App. 3d 446, we examined the application of this statute and concluded that a computer-generated printout would constitute a "written" result within the meaning of section 11—501.4: ·

"We can perceive of no practical or legal difference between a written recordation of the laboratory blood-alcohol test results and a printout generated by a computer integrally connected to the testing instrument. It would certainly make no difference to a physician involved in the emergency treatment of a patient that laboratory results such as BAC are presented via a computer-generated printout rather than by some other form of written documentation. In our view, an efficient and effective way to deliver this needed information to a doctor engaged in the life and death struggle that often occurs in an emergency room is to deliver it directly from the laboratory to the emergency room via computer. To do otherwise might hinder the delivery of emergency medical services. Because of our belief that computer-generated printouts may be commonly used by emergency medical care providers under circumstances similar to those present in this case, we hold that such printouts are the functional equivalent of written test results as contemplated by section 11—501.4." *Ethridge*, 243 Ill. App. 3d at 463.

We agree, therefore, with defendant's statement that the computer-generated printout provided to Kanehann in the emergency room would have been admissible at trial under section 11—501.4. The question remains, however, whether the test results were admissible in the form of the summary printout generated several days later. Under certain limited conditions designed to insure that the written results of tests would be trustworthy and reliable, section 11—501.4 allows the admission of the written results of BAC tests conducted

upon persons receiving emergency medical treatment in a hospital. (See *People v. Hoke* (1991), 213 Ill. App. 3d 263, 269-70.) "The legislature obviously concluded that if these blood-alcohol test results are sufficiently trustworthy and reliable for the emergency room physician to use and consider when deciding what treatment is appropriate, then those results are sufficiently trustworthy and reliable to be received into evidence at a later trial." (*Hoke*, 213 Ill. App. 3d at 270.) This reliability derives, in part, because the results are obtained and used for the purposes of medical treatment and because they are memorialized in the form of a written hospital record.

Buck testified that, after she telephoned the test results to the emergency room staff, she entered the information into the hospital's computer system. Buck stated that once she verified this information, it was made part of defendant's permanent medical summary, and a computer printout was generated in the emergency room, where it was used by Kanehann for purposes of defendant's diagnosis and treatment. Testimony was also presented to show that new summaries, compiling the earlier test results and other medical information, were generated twice a day during defendant's stay, and these summaries included defendant's blood-test results. Analyzing "hearsay" information contained in "computer-stored" and "computer-generated" records presents difficulties because so many of our hearsay rules were developed to address concerns with *printed* as opposed to digitalized media. (See, *e.g., People v. Holowko* (1985), 109 Ill. 2d 187; *People v. Casey* (1992), 225 Ill. App. 3d 82.) In contrast to records directly generated by the computer itself (*e.g.,* telephone trap results), printouts of computer-stored data constitute statements placed into the computer by out-of-court declarants and cannot be tested by cross-examination. (*Holowko*, 109 Ill. 2d at 191; *Casey*, 225 Ill. App. 3d at 89.) Such information should therefore not be admitted absent some exception to the hearsay rule. (*Casey*, 225 Ill. App. 3d at 89.) It is important to note that the emergency room printout of defendant's blood-test results was merely a copy of information which was stored in, and remained part of, defendant's permanent medical records. Section 11—501.4 recognizes that there is an inherent necessity placed upon hospital personnel to be accurate in obtaining and maintaining information which is being used for medical purposes. It is unrealistic to recognize the reliability of the information contained in an emergency room printout without acknowledging the reliability of the same information contained in the computer memory. Regardless of whether the information is viewed in its computer-stored state or as a printout, the hearsay concerns underlying the information's admissi-

bility grow out of the data entry process; the entry of information into computer-stored form is the "declaration" which we must focus upon when analyzing admissibility under the hearsay rule and its many exceptions. We hold, therefore, that the memorialization of defendant's test result in a computer-stored form was sufficient to satisfy the "writing" requirement of section 11—501.4. The subsequent printout of defendant's permanent medical summary, or for that matter the original emergency room printout, is merely a copy of this "writing" and can be considered analogous to a photocopy of a printed document.

Aside from any concerns regarding the authentication and the adequacy of the foundation for the admission of computer-generated hearsay, which were not presented in this case, we see no reason to preclude arbitrarily the use of a copy of written test results which would otherwise be admissible under section 11—501.4. We must also recognize that hospitals are institutions that operate independently of law enforcement agencies. Hospitals maintain records under a variety of systems and for a variety of reasons unrelated to the administration of criminal justice. Section 11—501.4 must be interpreted and applied in the context of the practicalities of the procedures actually employed by health care professionals.

We also note that the information contained in the summary came into evidence through a number of different channels. Oral testimony was provided by Buck and Kanehann as to the results of defendant's blood test. Additionally, Kanehann entered the information contained in the emergency room printout onto the face sheet of defendant's emergency room patient chart. All of this testimony verified the test results appearing in defendant's medical summary. We also agree with the State's contention, therefore, that if any error occurred, it would have been harmless. (See *People v. Saulsburry* (1989), 178 Ill. App. 3d 857, 863-64.) We disagree with defendant's statement that we must presume prejudice because, if the summary had been excluded, the case would have come down to defendant's word against Buck's testimony about the result of the test she ran on defendant's blood. First, we note that defendant's testimony was also challenged by the physical observation of his condition by the hospital staff, which included their detection of an odor of intoxicants. Second, the credibility of Buck's recollection was bolstered by the recollection of Kanehann and the notations she made after receiving the emergency room printout, not just by the fact that the test results were also memorialized in defendant's permanent medical summary. Even if we were to con-

clude, therefore, that error had occurred, such error would be harmless.

The next argument raised by defendant concerns whether defendant was denied a fair trial based upon various comments of the prosecutor during closing arguments: (1) that Gluth testified that he had not used an alcohol swab to clean defendant's wounds; (2) that Buck had an independent recollection of defendant's blood-alcohol test results; (3) that Rembacz and Skaja testified that they detected a strong odor of alcohol about defendant; and (4) whether it was reasonable to find that the victim "with no alcohol, no drug in her system, in general good health, would cross the center line for no apparent reason and strike a 'drunk' head-on." Defendant concedes, again, that no objections were raised at trial to these various comments and requests that we conduct a plain error analysis.

As previously noted, we do not find the evidence to have been closely balanced. We also conclude that the prosecutor's comments, when viewed in their entirety, did not deprive defendant of the fundamental right to a fair trial. The State is allowed substantial latitude in closing argument (*People v. Williams* (1991), 147 Ill. 2d 173, 231; *People v. Pecoraro* (1991), 144 Ill. 2d 1, 16; *Markiewicz*, 246 Ill. App. 3d at 49), and the prosecutor has the right to comment on the evidence even if unfavorable to defendant (*People v. Johnson* (1992), 149 Ill. 2d 118, 145; *Markiewicz*, 246 Ill. App. 3d at 49). The prosecutor may not, however, make arguments that are not based upon the evidence. (*People v. Jahn* (1993), 246 Ill. App. 3d 689, 707.) Although the State's comments may exceed the bounds of proper argument, the verdict must not be disturbed on review unless, considering the entire context in which the statements were offered, they clearly affected the outcome of the trial. *Jahn*, 246 Ill. App. 3d at 707-08; *Markiewicz*, 246 Ill. App. 3d at 52.

■ We specifically find that the prosecutor's statements concerning Buck, Rembacz, and Skaja were fair comments based on the testimony. Although the prosecutor's remark that Gluth did not use an alcoholic swab was not an accurate reflection of the witness' testimony, we find that any prejudice accruing to defendant from this misstatement could not have affected the outcome of the case given the totality of the evidence and considering our earlier analysis. Finally, although we recognize that the term "drunk" is commonly used to refer to an alcoholic, the term may also be employed when referring to an individual's state of intoxication at a particular point in time. Considering the context in which this statement was made, we conclude that it was not an attempt by the State to imply that the

defendant was a chronic abuser of alcohol. Rather, it was a reference to his state of intoxication on the evening in question and was accordingly a fair comment based upon the evidence.

■ Defendant has asserted, as a corollary argument to each of the preceding "plain error" claims, that he did not receive the effective assistance of counsel at trial. As an additional ground, defendant asserts that counsel was incompetent during post-trial proceedings for failing to preserve issues through the filing of a post-trial motion. In *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052, the Supreme Court of the United States established a two-prong test for evaluation of the merit of ineffective assistance of counsel claims. Generally, a defendant claiming ineffective assistance of counsel must show (1) that counsel's performance was so seriously deficient as to fall below an objective standard of reasonableness under prevailing norms, and (2) that the deficient performance so prejudiced the defense as to deny the defendant a fair trial. (*Strickland*, 466 U.S. at 687-89, 80 L. Ed. 2d at 693-94, 104 S. Ct. at 2064-65; *People v. Collins* (1992), 153 Ill. 2d 130, 137; *People v. Edgeston* (1993), 243 Ill. App. 3d 1, 12.) A court may proceed directly to the second part of the *Strickland* test and, if it does not find the requisite prejudice, may decide the claim without analyzing the effectiveness of counsel's representation. (*People v. Enoch* (1991), 146 Ill. 2d 44, 56-57; *Edgeston*, 243 Ill. App. 3d at 12.) The second prong requires a defendant to demonstrate a reasonable probability that, but for counsel's errors, the result of the proceedings would have been different. (*Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068; *People v. Eddmonds* (1991), 143 Ill. 2d 501, 511-12; *Edgeston*, 243 Ill. App. 3d at 12.) The defendant bears the burden of showing that, absent counsel's errors, the fact finder would have had a reasonable doubt of guilt. (*Edgeston*, 243 Ill. App. 3d at 12.) We have reviewed each of the claims raised by defendant under the doctrine of plain error, and we do not agree that prejudicial error occurred. We must also conclude, therefore, that defendant has failed to demonstrate the actual prejudice needed to succeed on his claims of ineffective assistance.

The next issue raised on appeal questions whether a defendant may be sentenced under the enhancement provision for reckless homicide committed while under the influence of alcohol or drugs (Ill. Rev. Stat. 1991, ch. 38, par. 9—3(e) (now 720 ILCS 5/9—3(e) (West 1992))) in the absence of a specific determination by the trier of fact that the defendant was under such influence. The State responds that it need not plead or prove intoxication from alcohol beyond a reasonable

doubt to the trier of fact during the trial in order to later enhance the penalty under the reckless homicide statute. Section 9—3(e) provides:

"In cases involving reckless homicide in which the defendant was determined to have been under the influence of alcohol or any other drug or drugs as an element of the offense, or in cases in which the defendant is proven beyond a reasonable doubt to have been under the influence of alcohol or any other drug or drugs, the penalty shall be a Class 2 felony, for which a person, if sentenced to a term of imprisonment, shall be sentenced to a term of not less than 3 years and not more than 14 years." Ill. Rev. Stat. 1991, ch. 38, par. 9—3(e) (now 720 ILCS 5/9—3(e) (West 1992)).

The primary object of statutory construction, which begins with the statutory language itself, is to give effect to the intent of the legislature. (*People v. Lowe* (1992), 153 Ill. 2d 195, 201.) Also, one of the basic tenets of statutory construction requires that a statutory interpretation avoid rendering any term or phrase a surplusage. (*People v. Kaminski* (1993), 246 Ill. App. 3d 77, 80-81; *Harris Bank v. Village of Mettawa* (1993), 243 Ill. App. 3d 103, 115.) We reject at the outset defendant's assertion that intoxication must always be alleged as an element of the offense of reckless homicide to invoke the enhanced penalty provisions under section 9—3(e). To accept this argument would render the second clause of the paragraph meaningless. Clearly the first part of section 9—3(e) contemplates charging defendants with a version of reckless homicide involving intoxication by alcohol or drugs. In such a case, the jury should be instructed that guilt is dependent upon finding all of the standard elements of reckless homicide plus an additional element of intoxication. We note that such an instruction was tendered by the State in this case, and requested by defendant, but later withdrawn in light of the Illinois Supreme Court's decision in *People v. Smith* (1992), 149 Ill. 2d 558, 565 (intoxication is not an element of reckless homicide). Instead, the standard Illinois Pattern Jury Instruction, Criminal, No. 7.10 (2d ed. 1981), was given over defendant's objection.

We do not mean to deviate, however, from the previously stated principle of law that, while recklessness may be inferred from evidence of intoxication, intoxication is not an essential element of reckless homicide. (See *Smith*, 149 Ill. 2d at 565; *People v. Edmundson* (1993), 247 Ill. App. 3d 738, 742.) A charge of reckless homicide may be supported without the element of intoxication, and it may still be possible that the enhancement provision of 9—3(e) may be applied. That section also provides for the imposition of an enhanced penalty

where a defendant is "proven beyond a reasonable doubt" to have been under the influence of drugs or alcohol when committing the crime. (Ill. Rev. Stat. 1991, ch. 38, par. 9—3(e) (now 720 ILCS 5/9—3(e) (West 1992)).) This provision would be applicable in the case of a defendant who is prosecuted, and ultimately convicted, in the same trial of both reckless homicide and an additional offense, such as driving while intoxicated (625 ILCS 5/11—501 (West 1992)), which requires that the defendant be proven to have been under the influence.

■ Recklessness may be based alternatively upon an underlying allegation of driving while intoxicated, an allegation of intoxication coupled with specific allegations of careless or reckless driving, or solely upon allegations of reckless driving. If intoxication is the sole allegation of recklessness, it is apparent that a jury could not convict a defendant of reckless homicide without having also found the defendant to have been under the influence. Thus, section 9—3(e)'s enhancement provision would necessarily be invoked. In the present action, however, we note that it was possible, under the instructions given, for the jury to conclude that defendant had recklessly driven his vehicle across the center line and into the oncoming lane of traffic even if it was not convinced that he had been under the influence of alcohol at the time. Although the verdict necessarily incorporates a finding of reckless driving, it does not necessarily establish that defendant was proven beyond a reasonable doubt to have been under the influence. Absent such a determination, we must conclude that the trial court committed reversible error in sentencing defendant pursuant to the enhanced penalty provision of section 9—3(e), rather than under the standard penalty range of two to five years' imprisonment. See Ill. Rev. Stat. 1991, ch. 38, par. 9—3(d)(2) (now 720 ILCS 5/9—3(d)(2) (West 1992)).

The State argues that it was proper for the sentencing judge to find the fact of intoxication during the sentencing phase of these proceedings. We need not address this argument, however, because the record demonstrates that the trial court failed to make the requisite finding of intoxication *beyond a reasonable doubt*. The State's argument is, therefore, factually inapplicable.

■ The last issue raised by defendant concerns the constitutionality of section 9—3(e)'s enhancement provisions for cases of reckless homicide committed by defendants who are under the influence of alcohol. In view of our conclusion that defendant's sentence must be within the Class 3 felony range, it is unnecessary to address his constitutional challenge. We note, however, that the court rejected identi-

cal challenges by the defendant in *People v. Warwick* (1993), 251 Ill. App. 3d 65, 70-71.

For the foregoing reasons, we affirm defendant's conviction of reckless homicide, but vacate his five-year sentence and remand the cause for resentencing as a Class 3 felony.

Affirmed in part; vacated in part and remanded.

McLAREN and QUETSCH, JJ., concur.